# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 1:24MJ425-1 |
| INFORMATION ASSOCIATED WITH GOOGLE LLC ACCOUNT KENFREE55@GMAIL.COM STORED AT PREMISES CONTROLLED BY GOOGLE | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the \_\_\_\_\_Northern\_\_\_\_\_ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1343, 1349 | Wire fraud, conspiracy to commit wire fraud |
| 18 USC 1956, 1957 | Money laundering, financial transaction money laundering |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of \_\_30\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/ Elizabeth Nawalaniec

*Applicant's signature*

Elizabeth Nawalaniec, Special Agent, FBI

*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: \_\_11/4/2024  8:59 am\_\_

*Judge's signature*

City and state: \_\_Durham, North Carolina\_\_

The Honorable Joe L. Webster, U.S. Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH GOOGLE LLC ACCOUNT KENFREE55@GMAIL.COM STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 1:24MJ425-1 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Elizabeth Nawalaniec, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with the email account KENFREE55@GMAIL.COM (the SUBJECT ACCOUNT), that is stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), an electronic service provided headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

2.      The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since October 2023. I am currently assigned to the FBI's Charlotte Field

Office, Greensboro Resident Agency. In this capacity, I am charged with investigating possible violations of federal criminal law. By virtue of my FBI employment, I perform and have performed a variety of investigative tasks, including functioning as a case agent on criminal cases. At the start of my employment, I received training on how to conduct criminal investigations at the FBI Academy in Quantico, Virginia. I have also received training and gained experience in interviewing and interrogation techniques, the execution of federal search warrants, seizures, and the identification and collection of evidence. From my training and experience, I have also become familiar with the techniques and methods used by criminal enterprises to evade law enforcement while conducting criminal activity, to include myriad ways to launder proceeds from illicit activity or forms of communication utilized to avoid law enforcement detection. In addition, I have worked with and consulted numerous agents and law enforcement officers who have conducted complex criminal enterprise investigations throughout the United States and beyond. Prior to becoming a Special Agent, I was employed by the FBI in multiple positions in FBI field offices and headquarters for over six years. In my prior roles with the FBI, I assisted with a variety of national security matters and criminal investigations.

4.      This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary for the limited

purpose of establishing probable cause to conduct a search of and for the items described in Attachments A and B for evidence, contraband, and/or instrumentalities of the criminal conduct described herein. Additionally, unless otherwise indicated, wherever in this Affidavit I assert that an individual made a statement, that statement is described in substance herein and is not intended to be a verbatim recitation of such statement. Furthermore, unless otherwise indicated, all statements contained in this Affidavit are summaries in substance and in part. The following is true to the best of my knowledge and belief.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1343 (wire fraud), 1349 (conspiracy to commit wire fraud), 1956 (money laundering), and 1957 (financial transaction money laundering), among others, have been committed by Kenneth A. Free Jr (FREE). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND OF INVESTIGATION
## DEFINITIONS AND TECHNICAL TERMS

7.      Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

8.      The term "email" (electronic mail) is defined as the text messages sent from one person to another via a computer, which may include images. Email can also be sent automatically to a large number of addresses via a mailing list.

9.      As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. The information stored in connection with an email account can indicate who has used or controlled the account. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Additionally, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## PROVIDER BACKGROUND

10.     Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital

payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

11.     The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

12.     Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

13.     Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account. Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below. Google maintains

records with respect to other Google Services, which it stores in connection with subscriber accounts, which typically include the following:

14. **Gmail:** Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

15. **Calendar:** Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

16. **Google Drive and Keep:** Google provides users with a certain amount of free "cloud" storage through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content). Users can purchase enhanced storage

capacity for an additional monthly fee. Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud," that is online. A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

17. **Photos:** Google provides users with a certain amount of free storage for photographs, through a service called Google Photos, which allows users to manually store photographs and videos, and which automatically uploads photographs and videos taken by registered mobile devices. Google also retains the metadata or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google, including to Google Photos. This metadata includes what is known as exchangeable image file format (or "Exif") data and can include GPS location information for where a photo or video was taken.

18. **Messaging:** Google allows subscribers to engage in "chat" sessions in an instant messaging format with other Google users, the transcripts of which are generally stored in a user's email content. Similarly, Google allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images. In general, Hangouts content is stored separately from a user's email and chat content.

19.     Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Meet and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

20.     When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

21.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the

devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help identify which computers or other devices were used to access the Google Account.

22.     Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

23.     In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

24.     Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

25.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

26.     Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. For example, a list of apps might reveal previously-unknown banking institutions or money service businesses used by the target. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

27.     Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crimes under investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

28.     In August 2022, the FBI began investigating FREE, an attorney at Knight and Free, PLLC in Greensboro, North Carolina (NC), after the North Carolina State Bar (NCSB) contacted the U.S. Attorney's Office for the Middle District of North Carolina

(USAO-MDNC) regarding a civil complaint that the NCSB filed against FREE in Guilford County, NC (the NCSB complaint).

29.    The complaint detailed that from at least June 2020 to April 2021, FREE served as escrow agent for United Med Test LLC (UMT) – a company that was purportedly selling personal protective equipment (PPE) during the COVID-19 pandemic – and the buyers of UMT's PPE.

30.    On or about May 5, 2020, FREE opened a First Bank IOLTA account ("First Bank IOLTA account") to hold escrowed funds for these transactions. On or about July 21, 2020, FREE opened a Bank of America IOLTA account ("Bank of America IOLTA account") to hold escrowed funds for these transactions.

31.    As further detailed below, four victim companies entered sales contracts and escrow agreements with UMT and, pursuant to these agreements, sent funds for the purchase of PPE to an IOLTA account maintained by FREE.

32.    In March 2022, FREE responded to the NCSB complaint and acknowledged, as escrow agent, he owed a fiduciary duty to both UMT and the buyer in each transaction.

33.    Yet, as further described below, contrary to the terms of the escrow agreements, Free made unauthorized disbursements of escrowed funds to himself, UMT representatives, and other entities who were not entitled to funds under the terms of the escrow agreement. In each instance, the buyer never received the PPE required by the sales contract. Only one of the four victim companies received any product at all, and that product was apparently counterfeit and in an amount much less than that which was agreed upon.

34.   Specifically, between June 29, 2020, and May 10, 2021, FREE, without authorization, disbursed approximately $140,925 from the First Bank IOLTA account to other accounts he controlled. And between July 7, 2020, and April 6, 2021, FREE, without authorization, disbursed approximately $4,120,656 to accounts controlled by representatives of UMT.

35.   By the time FREE and UMT entered agreements with Victim Company 3 and Victim Company 4, FREE was already aware UMT had not fulfilled its contractual obligations to Victim Company 1 and Victim Company 2, both of which had already filed civil complaints in Guilford County, NC against UMT and FREE.

36.   According to bank records, the SUBJECT ACCOUNT has been associated with FREE's bank accounts at Capital One, Citibank and First Horizon Bank, and other financial accounts. Additionally, FREE used the SUBJECT ACCOUNT for his communications with UMT and at least three of the four identified victim companies.[1]

**Victim Company 1**

37.   On or about June 24, 2020, UMT entered into a sales contract and escrow agreement with Victim Company 1 for UMT to sell 565,000 3M N95 masks for $1,500,000. The escrow agreement was signed by FREE, a UMT representative, and the CEO of Victim Company 1. The escrow agreement listed FREE's contact information, including the SUBJECT ACCOUNT. According to the sales contract and escrow agreement, the funds

---

[1]   The investigation identified a second email address associate with Free – kfree@knightandfreelawteam.com - that appeared to be his email address from his law firm employment.

were to be held by FREE in escrow until Victim Company 1 received and satisfactorily inspected the masks.

38.     According to the escrow agreement, only Victim Company 1's customer, on whose behalf the masks were being procured, could authorize payments to be released by FREE to UMT via written consent. Neither Victim Company 1 nor its customer ever provided consent for the escrow payment to be released by FREE to himself or any representatives of UMT.

39.     On or about June 26, 2020, an attorney wired $1,500,000 to the First Bank IOLTA account on behalf of Victim Company 1. In or about September 2020, UMT delivered only 92,640 of the 565,000 masks, totaling approximately $277,920. UMT did not make available for inspection or delivery any of the remaining masks.

40.     On or about October 22, 2020, Victim Company 1 contacted FREE seeking the return of the remaining $1,290,341.50 in escrow. According to an interview in February 2023 of the CEO of Victim Company 1, FREE reassured the CEO on multiple occasions the escrow money was secured and remained in the First Bank IOLTA account. As of October 22, 2020, the balance in the First Bank IOLTA account was $42.58.

41.     On October 26, 2020, using the SUBJECT ACCOUNT, FREE informed Victim Company 1 that UMT asserted the delay fell under the force majeure clause of the contract, stating the delays were beyond their control and unforeseen. FREE stated the order would be closed out on or before November 6.

| From: | Kenneth Free <kenfree55@gmail.com> |
| Sent: | Monday, October 26, 2020 12:29 PM |
| To: | ████████ |
| Cc: | ████████████████████████████████████ |
| Subject: | RE: By America/United Med Test deal |

Neal,

My apologies for not getting to you sooner. My family and I were quarantined and we have just been cleared today. I did receive your email and I have had a chance to discuss with my client with respect to the demand. Seller is asserting that the delay falls under the Clause 9 of the contract. The order will be closed out on or before November 6. More over, the buyer, at their insistence, wanted partial shipment to be delivered and that was performed. Receipt of the partial shipment alone locks the buyer in until the contract is fulfilled. In any event, it is United Med Test position that they are performing and that the delays were beyond their control and unforeseen. I will stay on top of my client to make sure everything is settled by November 6.

Thanks,

KAF

42.     However, at the time FREE wrote the above email, he had already distributed the majority of the escrowed funds and the First Bank IOLTA account balance was only $42.58.

43.     Specifically, between approximately June 29, 2020, and November 3, 2020, FREE made at least 14 transfers totaling approximately $60,050 from the First Bank IOLTA account to other bank accounts he controlled. In the same time period, FREE also made three transfers totaling approximately $292,710 to companies controlled by UMT representatives; and one transfer of approximately $1,375,000 to Terminator Armor Inc., a company run by the subjects of two former FBI corporate fraud investigations. While these transfers were not entirely comprised of the funds Victim Company 1 had held in escrow with FREE, their funds represented approximately seventy percent of the funds in the account during the time period of these transfers.

44.     In June 2021, FREE assured an attorney for Victim Company 1 the money would be paid back and sent a screenshot showing an account balance with enough money to repay Victim Company 1 in full. According to the attorney, those funds were ultimately frozen pursuant to an order obtained by the NCSB and seized to be sent to a different victim

company to whom the funds were owed. According to an interview in February 2023 of the CEO of Victim Company 1, Victim Company 1 eventually received repayment of only $45,000 of the funds owed from the First Bank IOLTA account.

**Victim Company 2**

45.     On or about October 26, 2020, UMT entered into the first sales contract and first escrow agreement with Victim Company 2 for UMT to sell 1,000,000 3M respirator masks for $3,250,000. The escrow agreement was signed by FREE, a UMT representative, and the owner of Victim Company 2.

46.     According to the sales contract and escrow agreement, the funds were to be held by FREE in escrow until Victim Company 2 received and satisfactorily inspected the masks from UMT. According to the escrow agreement, only Victim Company 2 could authorize payments to be released by FREE to UMT via written consent. Victim Company 2 never provided consent for the escrow payment to be released by Free to himself or any representatives of UMT.

47.     According to bank records, the NCSB complaint, and an interview of the owner of Victim Company 2, on or about October 29, 2020, Victim Company 2 wired approximately $3,250,000 to the Bank of America IOLTA account. However, the funds were frozen by Bank of America and no masks were delivered.

48.     On or about November 10, 2020, Victim Company 2 entered a second escrow agreement with UMT and FREE. On that day, a UMT representative emailed Victim Company 2 and FREE, including the SUBJECT ACCOUNT, regarding the escrow agreement.

**From:** Customer Service unitedmedtestnationwide@gmail.com  📎
**Subject:** New Bank
**Date:** November 10, 2020 at 4:03 PM
**To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Kenneth Free, Jr. kfree@knightandfreelawteam.com, Kenneth Free kenfree55@gmail.com, admin@unitedmedtestllc.com

We need to send a wire to this bank.

Thanks
Tavion



Escrow
Agree...gel.pdf

49.　　On or about November 13, 2020, Victim Company 2 wired approximately $1,625,000 to the First Bank IOLTA account. The owner of Victim Company 2 informed UMT and FREE via email that Bank of America put a hold on the transfer and warned him they believed his transaction was the result of a scam. A UMT representative responded stating, "We are not a scam we are real company that sells units all around the world. This scenario is a bunch of hourly employees don't know the difference between an escrow account and a regular business checking account."

50.　　FREE responded from the SUBJECT ACCOUNT, as shown below, stating the bank was being overly protective and instructing Victim Company 2 to "make it clear that you ate [sic] aware of this deal and know all the parties involved and want to move forward and to release the hold so we can conclude business."

On Nov 13, 2020, at 10:01 AM, Ken Free <kenfree55@gmail.com> wrote:

I am working on clearing everything. BOA is being overly protective. They are telling me it is coming from Barclays. I hope Barclays and your company make it clear that you are aware of this deal and know all the parties involved and want to move forward and to release the hold so we can conclude business.

Kenneth A. Free, Jr., Esq.
KNIGHT & FREE, PLLC
503 W. McGee Street
Greensboro, North Carolina 27401
Telephone: (336) 370-6950
Facsimile: (336) 265-8262
kfree@knightandfreelawteam.com
Sent from my iPhone

> On Nov 13, 2020, at 9:34 AM, TAVION BLACKMON <unitedmedtestnationwide@gmail.com> wrote:

Wow I am speechless. BOA is full of themselves am glad they responded to your director . We are not a scam we are real company that sells units all around the world. This scenario is a bunch of hourly employees don't know the difference between an escrow account and a regular business checking account. As I stated before Mr. free will be filing a complaint with the banking regulations department in North Carolina. Mr. Free has not arrive yet to the bank nor has he heard anything like this the last thing Bank of America said is going to hold us off there was some correspondence letting them know that I want to return the funds to the Sunday which we have agreed . No where in history has wires been placed on hold for a period of 10+ days it is unheard of in the banking world. Bank wires checks are traceable instruments which provide proof who sent it and who received. ████ I think after we've had multiple conversations and emails your judgment should be this is a banking nightmare you yourself had a run-in with Bank of America this is nothing made up just pure nonsense. We're on the same team and look forward to delivering your units and continuing providing you supply for your client I believe a zoom call has been scheduled for 2:30 PM today. Have a great day

Thanks
Tavion

> On Nov 13, 2020, at 9:26 AM, ████████████ wrote:

Just so you know BoA have quote from my director

' We've just had a swift reply from BoA stating that they truly believe you are a victim of a business email scan, and if they release the funds are certain there will be no recovery for you. I don't suppose you've heard yet from the recipient details of a return as it's probably too early over there?'

My bank is obviously getting very concerned what I am doing and my judgement, please Kenneth can we clear up who and what is going on, I need details ASAP

51.  According to the complaint and an interview of the owner of Victim Company 2, Victim Company 2 never received any product and never authorized any payment to be released by FREE from the First Bank IOLTA account. However, on November 16, 2020, FREE disbursed $1,225,000 from the First Bank IOLTA to Lion Commerce. The payment to Lion Commerce was related to the acquisition of masks, according to an interview of the owner of Victim Company 2. Also according to an interview of the owner of Victim Company 2, FREE later stated the masks from Lion Commerce had been stolen when the trucks carrying the masks were hijacked. FREE and UMT told the owner of Victim Company 2 not to worry because they knew people in the

FBI and government and would get the funds back from Lion Commerce. On November 20, 2020, FREE disbursed $65,000 to a company controlled by a representative of UMT.

52.    According to an interview of the owner of Victim Company 2, UMT then stated they found another mask supplier in Canada. On or about December 9, 2020, Victim Company 2 entered a second sales contract for 500,000 masks and a third escrow agreement with UMT and FREE. On or about December 11, 2020, Victim Company 2 wired an additional $1,824,980 to the First Bank IOLTA account. The owner of Victim Company 2 emailed UMT representatives and FREE at the SUBJECT ACCOUNT to provide payment confirmation and the signed purchase and escrow agreements. Later that day, FREE responded from a different email address, kfree@knightandfreelawteam.com, with the SUBJECT ACCOUNT copied, confirming he could see the wire pending.

53.    On or about January 12, 2021, FREE returned $3,060,230.18 to Victim Company 2 from the Bank of America IOLTA account. However, FREE retained the remaining $189,769.82, although the signed escrow agreement, as shown below, stated, "SELLER pays 100% escrow fee."

5.    Escrow Service Fees: **SELLER pays 100% escrow fee.** The fees payable to the Escrow Attorney will be owed and deemed immediately paid upon the receipt of the Escrowed Funds and will be one percent (1%) of the Escrowed Funds (the "**Escrow Service Fees**"). The Escrowed Service Fees shall not be depending upon the completion of the underlying transaction. The Escrow Attorney shall have no liability to any party provided the Transferable Amount is faithfully disbursed in accordance with the terms and conditions of this Escrow Agreement. All fees for the escrow services shall be paid from the Escrowed Amount.

54.    On January 14, 2021, FREE emailed the owner of Victim Company 2 from a different email address, kfree@knightandfreelawteam.com, stating, as shown in red below, "I did move part of the funds to another escrow account which included my fee

(which is paid pursuant to escrow agreement) and part of any unexpected fees. Before I could send the required amount for payment, BOA held the funds. Your money is safe and when I receive the funds that were held in the other account, it will be returned minus my escrow fees. I was told I should have that in the next 10 banking days."

On 14 Jan 2021, at 15:20, Kenneth A Free, Jr., Esq <kfree@knightandfreelawteam.com> wrote:

Good Morning ████

Hope you are well. See my answers in red.

1. The first agreement for $3,250,000. These funds were withheld by the Bank of America as we know and as you know they returned only $3,060,230.18 after 78 days. Please can you explain where the remaining funds are and when can you return these to me? The amount is $ 189,769.82. I urgently need the return of this please. Pursuant to the Escrow agreement, half of the deposited amount was to be paid upon receipt of delivery information. That was provided, I did move part of the funds to another escrow account which included my fee (which is paid pursuant to escrow agreement) and part of any unexpected fees. Before I could send the required amount for payment, BOA held the funds. Your money is safe and when I receive the funds that were held in the other account, it will be returned minus my escrow fees. I was told I should have that in the next 10 banking days.

55.    On January 20, 2021, in response to a demand from the owner of Victim Company 2 that FREE return the $189,769.82 fee he retained, FREE sent an email from kfree@knightandfreelawteam.com stating, "With respect to my fee, you need to read the paragraph thoroughly. It clearly states that I get paid for my services whether or not the deal is completed. As far as that is concerned, it is not negotiable."

56.    The correct quantity of satisfactory goods was never delivered, and Victim Company 2 never authorized the release of funds in the First Bank IOLTA account. Yet, between December 14, 2020, and January 22, 2021, FREE disbursed approximately $1,788,700 to 25Hrs Trading PTE LD, a company located in Singapore; $20,000 to an account controlled by UMT representatives; and $16,775 to another account he controlled.

57.    UMT eventually delivered only 3,500 of the agreed upon 500,000 masks. On January 27, 2021, a representative of Victim Company 2 emailed UMT notifying them the delivered masks appeared defective and possibly counterfeit and were consequently rejected by Victim Company 2. Later that day, a UMT representative responded via email with the SUBJECT ACCOUNT copied insisting the units were not counterfeit:

From: admin@unitedmedtestllc.com <admin@unitedmedtestllc.com>
Sent: 27 January 2021 13:34
To: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Cc: Customer Service <unitedmedtestnationwide@gmail.com>; Kenneth A Free, Jr., Esq <kfree@knightandfreelawteam.com>; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Ken Free <kenfree55@gmail.com>
Subject: Re: UMT Delivery to Ghekko ***Suspected Counterfeit 3m 9332+respirators***

Johnny just reply those labels are in master cartoon shipment they where include in packaging . Here is sample of how sticker looks . All units are real and valid came from authorize distributor with documentation which was provide to you . Idk why you would assume something is counterfeit . However the FF booked ups delivery in there system is not my concern his job make sure all shipment arrives . Keep in mind this package where shipped to many distributions center and countries before it arrived to you . You are welcome to do any testing on mask!!! As we know it's. Genuine product sold by reputable authorize distributor. As far the contract goes there guidelines in contract which legal department will handle . You are welcome to report anything but don't be surprise when they hand you back the packages saying this real product !!!

Thanks

58.    On February 9, 2021, FREE stated he would return to Victim Company 2 the remaining funds in the First Bank IOLTA; however, bank records show the account balance on that date as $58.58. According to an Order to Release Funds Subject to Preliminary Injunction (the Order) entered on July 29, 2021, by a Superior Court Judge in Guilford County in response to the NCSB complaint, the court found Victim Company 2's funds from the second and third escrow agreements had been fully disbursed from the IOLTA account by April 22, 2021 even though Victim Company 2 had not authorized disbursement of the funds. The funds were never returned, according to an interview of the owner of Victim Company 2.

**Victim Company 3**

59. On or about March 31, 2021, UMT entered into a sales contract and escrow agreement with Victim Company 3 for UMT to sell 250,000 boxes of Cranberry Evolve nitrile gloves. The escrow agreement was signed by FREE, a UMT representative, and the CEO of Victim Company 3.

60. According to the sales contract and escrow agreement, the funds were to be held by FREE in escrow until Victim Company 3 received and satisfactorily inspected the gloves. According to the escrow agreement, only Victim Company 3 could authorize payments to be released by FREE to UMT via written consent. Victim Company 3 never provided consent for the escrow payment to be released by Free to himself or any representatives of UMT.

61. On or about April 1, 2021, Victim Company 3 wired $5,225,000 to the First Bank IOLTA account. That same day, FREE wired approximately $30,000 to another account he controlled. On April 5 and 6, 2021, FREE made four wire transfers totaling approximately $3,742,946 to accounts controlled by representatives of UMT, even though Victim Company 3 never authorized any funds to be disbursed from the escrow account.

62. On or about April 23, 2021, FREE disbursed $5,225,000 from the First Bank IOLTA account to the law firm Sills Cummis and Gross PC in purported return of the escrow funds from Victim Company 3. However, as explained in the previous paragraph, the funds from Victim Company 3 had already been disbursed. The funds FREE returned belonged to Victim Company 4. In response to the NCSB complaint, FREE admitted he knew the funds disbursed to Victim Company 3 belonged to Victim Company 4, knew

Victim Company 3 was not entitled to the funds, and knew he was not authorized to disburse Victim Company 4's funds to Victim Company 3.

63. Victim Company 3's former CEO confirmed that communication with FREE occurred via email, among other methods. However, Victim Company 3 was unable to provide documentation of its communications with FREE due to the length of time passed, the former CEO's transition out of the company, and the former CEO's transition to a new cell phone and computer onto which the files were not backed up. However, based on FREE's repeated use of the SUBJECT ACCOUNT to perpetuate non-delivery scams with the other identified victims, there is probable cause to believe FREE used the email address to perpetuate the scam against Victim Company 3.

**Victim Company 4**

64. Victim Company 4 is a nonprofit corporation that provides employment for adults with severe disabilities. On or about April 21, 2021, UMT entered into a sales contract and escrow agreement with Victim Company 4 for UMT to sell 500,000 boxes of Cranberry Evolve nitrile gloves.

65. The escrow agreement was signed by FREE, a UMT representative, and the CEO of Victim Company 4. The escrow agreement listed FREE's contact information, including the SUBJECT ACCOUNT. According to the sales contract and escrow agreement, the funds were to be held by FREE in escrow until Victim Company 4 received and satisfactorily inspected the masks.

66. According to the contract, Victim Company 4 was required to pay 50% of the total purchase price of $11,950,000 to the First Bank IOLTA account within 24 hours

of contract execution. On or about April 22, 2021, Victim Company 4 wired $5,975,000 to the First Bank IOLTA account. On the same day, a UMT representative emailed FREE at a different email address, kfree@knightandfreelawteam.com, and a representative of Victim Company 4 directing FREE to refund the escrowed funds to Victim Company 4 as the product was not made available by UMT for inspection. The UMT representative told FREE, "Contract states refund if we are unable to show product for inspection with [sic] 2 business days."

| From: | |
|---|---|
| To: | |
| Cc: | kfree@knightandfreelawteam.com; admin@unitedmedtestllc.com |
| Subject: | Re: escrow correction - Deposit Wire Tracking Information |
| Date: | Thursday, April 22, 2021 4:45:49 PM |
| Attachments: | mideon logo for email.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |

[Warning: External e-mail]

Begin processing refund as soon as possible for Ready One. We were unable to meet with them today. Contract states refund if we are unable to show product for inspection with 2 business days. Buyer will confirm request for refund as well.

67. Also on April 22, 2021, according to text messages produced in discovery for Victim Company 3's civil suit against FREE, FREE texted a UMT representative a screenshot of a text conversation in which FREE appeared to state, "What are we going to do if we have to return these funds." FREE then added, "I can't give this money back if I am refunding [first name of CEO of Victim Company 3]." Shortly thereafter, FREE texted the UMT representative, "We are fucked!!!" and "Set it up we can't allow a refund." On or about April 23, 2021, FREE disbursed $5,225,000 from the First Bank IOLTA account to Victim Company 3, decreasing the balance in the account to $2,301,923.58.

68.     Between approximately April 26, 2021, and April 28, 2021, FREE emailed

Victim Company 4 using the SUBJECT ACCOUNT insisting the request to return the

funds had been submitted to the bank. On April 27, 2021, as shown below, FREE stated

the delay occurred because it was a "small community bank" which was "very suspicious

of big wires going in and out quickly," so his "bank officer [was] waiting on approval to

send the wire."

| | |
|---|---|
| From: | Kenneth Free <kenfree55@gmail.com> |
| Sent: | Tuesday, April 27, 2021 10:47 AM |
| To: | ████████ Kfree@knightandfreelawteam.com |
| Cc: | ████████████████████████████████████████ |
| Subject: | RE: Transfer |

<mark>[Warning: External e-mail]</mark>

My apologies,

As stated yesterday, the request is submitted. Being that my bank is a small community bank, they are very suspicious of
big wires going in and out quickly. Due their concern, my bank officer is waiting on approval to send the wire. As soon as
it is done we will send out. It should not be much longer. I will keep you posted.

KAF

69.     On April 28, 2021, even though FREE knew he already disbursed the funds,

FREE stated "the funds are secure and will be returned" but "may take 5 to 7 banking days

for return due to [his] banks [sic] due diligence" period. FREE stated, "the funds are secure

and will be returned." However, the balance in the First Bank IOLTA account on that date

was only $2,301,923.58, significantly less than the $5,975,000 refund amount owed.

Victim Company 4 requested a copy of the bank transfer request, which FREE did not

provide.

On Apr 28, 2021, at 9:51 AM, ████████ <████████████ █████████> wrote:

Mr. Free,
Could you send us your request for transfer to your bank, and can we also talk to
your banker about the status of this transfer, this is getting critical now. Please
advice as to status.
Regards,
████

| | |
|---|---|
| From: | Ken Free |
| To: | ████████ |
| Cc: | ████████████████████████████ |
| Subject: | Re: Transfer |
| Date: | Wednesday, April 28, 2021 10:40:04 AM |

<mark>[Warning: External e-mail]</mark>

Gentlemen,

I have just got of court and I see your email. Let me start off and apologize for the delay.
Jeremy should have explained as I did yesterday that returns may take 5 to 7 banking days for
return due to my banks due diligence. I will contact them to see if their internal review is done
so the funds will be released. Since this is day 5, I am hopeful it will get done today. I will let
you know as soon as I get the word. Again, the funds are secure and will be returned. Also,
please stop flooding my firm with calls. There is no need for that nor call the bank. Please
contact via email. I will be back in touch soon.

KAF

70. In response to the NCSB complaint, FREE admitted he falsely suggested to
Victim Company 4 that he maintained the full amount of Victim Company 4's escrow
funds in the First Bank IOLTA account and was awaiting bank approval to disburse the
funds to Victim Company 4.

71. On May 7, 2021, the President of Victim Company 4 sent FREE a letter
demanding the return of funds, noting both the buyer and seller had provided written
instruction on April 22, 2021 that the transaction would not occur and the funds were to be
returned.

72. Despite the demand letter, on May 10, 2021, FREE transferred $20,000 from
the First Bank IOLTA account to another account he controlled. In response to the NCSB

complaint, FREE admitted his escrow fee was to be paid by UMT and the escrow agreement expressly stated FREE's escrow fee "shall not be paid from the Escrow Funds." In response to the NCSB complaint, FREE stated this transfer of funds was an "accounting error."

73.     On May 18, 2021, a UMT representative advised Victim Company 4 via email with the SUBJECT ACCOUNT copied that FREE would send the wire transfer that day and provide confirmation of such. However, Victim Company 4 never received confirmation of the wire.

**From:** admin@unitedmedtestllc.com <admin@unitedmedtestllc.com>
**Sent:** Tuesday, May 18, 2021 11:59 AM
**To:** ▬▬▬▬▬▬▬▬▬
**Cc:** ▬▬▬▬▬▬▬▬▬ Kenneth Free <kenfree55@gmail.com>; ▬▬▬▬▬
▬▬▬▬▬▬▬▬▬
**Subject:** Re: demand letter

[Warning: External e-mail]

Hi ▬▬

My understanding you should be receiving your wires transfer based on information I received should be resolved today.

Thanks

▬▬▬

**From:** admin@unitedmedtestllc.com
**To:** ▬▬▬▬▬▬▬▬▬
**Cc:** ▬▬▬▬▬▬ Kenneth Free; ▬▬▬▬▬
**Subject:** Re: demand letter
**Date:** Tuesday, May 18, 2021 4:24:58 PM
**Attachments:** image002.png

[Warning: External e-mail]

▬▬▬▬
I am unaware of any threats and you're talking about. My email is very clear I am not implying anything but answering your email and your question below base on information I received. Mr. Free should have your confirmations sent out to you shortly and this matter should be closed.

Thanks

▬▬▬

74.    On May 19, 2021, FREE emailed the President of Victim Company 4 using the SUBJECT ACCOUNT stating he "owe[d] a duty to both parties" and would "do as the parties wish[ed]" once the "dispute" was cleared.

**From:** Kenneth Free <kenfree55@gmail.com>
**Sent:** Wednesday, May 19, 2021 8:01 AM
**To:** ████████████████ admin@unitedmedtestllc.com
**Cc:** ████████████████████████████████████ Gmail <kenfree55@gmail.com>
**Subject:** RE: demand letter

[Warning: External e-mail]

████████

I was in trial yesterday and today, we do not start till 10:30am so I wanted to respond. I am the escrow agent and I do not represent anyone but owe a duty to both parties. We are on the east coast and I received these correspondences well in the afternoon. UMT keeps sending different messages as to your transaction. Under the rues and law, I do as the parties wish. It is clear there is a dispute. Once this is cleared I will act accordingly.

KAF

75.    That same day, an attorney for Victim Company 4 sent FREE a letter demanding repayment of the funds by May 20, 2021. On May 20, 2021, FREE responded via email from kfree@knightandfreelawteam.com stating, "I am in receipt of your demand. I have notified United Med Test as well as my insurance provider of the demand."

**From:**        Kenneth A Free, Jr., Esq <kfree@knightandfreelawteam.com>
**Sent:**        Thursday, May 20, 2021 12:30 PM
**To:**          ████████████ 'kfree@knightandfreepllc.com'
**Cc:**          'admin@unitedmedtestllc.com'; '████████████████
**Subject:**     RE: Critical Material Escrow Agreement - Demand to Return ReadyOne's Funds By Noon Eastern on May 20, 2021

████████

Sorry for the late response. I am in receipt of your demand. I have notified United Med Test as well as my insurance provider of the demand. I will notify you as to the demand as soon as I hear from them.

Thanks

KAF

76.    On May 20, 2021, an attorney for Victim Company 4 had a telephone call with FREE and subsequently provided written rejection via email of FREE's request for an extension to return the funds to Victim Company 4.

Dear Mr. Free:

This follows our phone conversation this afternoon. ████████████████, Inc. (██████████) rejects Knight and Free, PLLC's request for an extension of time to return ██████████'s funds. ██████████ demands that Knight and Free, PLLC immediately return its initial deposit of $5,975,000.00 plus interest at the legal rate of 8% per year. Interest is another $34,049.32 as of today, May 20, 2021, and increases by $1,309.59 a day.

77.    On May 21, 2021, FREE emailed the attorney for Victim Company 4 using the SUBJECT ACCOUNT stating once UMT sent him "written authorization to return the funds" he would send the refund.

| | |
|---|---|
| From: | Kenneth Free <kenfree55@gmail.com> |
| Sent: | Friday, May 21, 2021 12:46 PM |
| To: | ██████████ kfree55@gmail.com; kfree@knightandfreelawteam.com |
| Cc: | ██████████████████████████████ |
| Subject: | RE: Critical Material Escrow Agreement - Demand to Return ██████ Funds By Noon Eastern on May 20, 2021 |

████████

I just spoke with UMT as they told me they were traveling and did not receive your latest email until now. I told them to send me written authorization to return funds and they have agreed. As soon as I receive the authorization I will send the refund. In light of this I ask that you please delay the filing.

Thanks,

KAF

78.    The Order entered in response to the NCSB complaint found "[t]he disbursements Free made from the trust account after [Victim Company 4]'s April 22, 2021 deposit were not made on behalf of [Victim Company 4]" and were used to fund other disbursements. On July 29, 2021, the Superior Court Judge ordered the balance of the trust

account funds belonged to Victim Company 4, $2,281.981.87 in total, and were to be returned within ten days of the Order.

79.     On or about August 2, 2021, FREE wired $2,281,981.87 from the First Bank IOLTA account to Victim Company 4. According to an interview of the President of Victim Company 4, Victim Company 4 was able to recover an additional $1,900,000 through an insurance claim.

# CONCLUSION

80.     Based on the foregoing, I request that the Court issue the proposed search warrant. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

81.     On July 2, 2024, I submitted a preservation request to Google for records related to the SUBJECT ACCOUNT with Google reference number 63903255. On August 18, 2024, Google confirmed the relevant records had been preserved and would be retained for a period of 90 days.

Respectfully submitted,

/s/ Elizabeth Nawalaniec

Elizabeth Nawalaniec

Special Agent
Federal Bureau of Investigation

On this day, the applicant appeared before me by reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

November 4, 2024  8:59 a.m.

The Hon. Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with KENFREE55@GMAIL.COM (the SUBJECT ACCOUNT) that is stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

**ATTACHMENT B**

**PARTICULAR THINGS TO BE SEIZED**

I.  **Information to be disclosed by Google LLC ("Google")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on July 2, 2024 with the Google reference number 63903255, Google is required to disclose to the government for each account or identifier listed in Attachment A the following information from **3/1/2020** to **4/1/2022**, unless otherwise indicated:

a. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1. Names (including subscriber names, usernames, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

3. Telephone numbers, including SMS recovery and alternate sign-in numbers;

4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

5. Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers;

6. Length of service (including start date and creation IP) and types of service utilized;

7. Means and source of payment (including any credit card or bank account number); and

8. Change history.

b.  All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

c.  Records of user activity for each connection made to or from the Account(s), including, for all Google services, the date, time, length, and method of connection, data transfer volume, usernames, source and destination IP address, name of accessed Google service, and all activity logs;

d.  **Gmail:** The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails;

e.  **Contacts:** Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history;

f.  **Google Drive and Keep:** The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google Classroom or Google Group), or third party application associated with each record; and all associated logs, including access logs and IP addresses, of each record;

g.  **Photos:** The contents of all media associated with the account in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses;

h.  **Calendar:** Any records pertaining to the user's calendar(s), including: Google Calendar events; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history;

i. **Messaging:** The contents of all text, audio, and video messages associated with the account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history;

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and/or instrumentalities of violations of 18 U.S.C. §§ 1343 (wire fraud), 1349 (conspiracy to commit wire fraud), 1956 (money laundering), and 1957 financial transaction money laundering) involving FREE in the SUBJECT ACCOUNT listed on Attachment A, in the form of the following:

a. Records, information, and communications referencing the Victim Companies, including the payment of funds from the Victim Companies;

b. Communications between FREE and agents or employees of United Med Test or others referencing the transactions or contracts with the Victim Companies and the payment of funds;

c. The identity of the person(s) who created or used the SUBJECT ACCOUNT, including records that help reveal the whereabouts of such person(s) at the time any records or information referenced in this Attachment B were generated or transmitted to other parties;

d. Evidence of efforts by FREE and/or co-conspirators to evade detection by law enforcement;

e. Evidence referencing or revealing the transfer of monies received from the Victim Companies through financial institutions, cryptocurrency exchanges, or other money transfer services; and

f. Evidence referencing or revealing possible additional victims of the fraud scheme under investigation, and information concerning the potential victims, to include names, personal identifiable information, accounts, contracts, invoices, communications, and any other information that could be used in furtherance of the subject offenses.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.